UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ROBERT G. BROWNELL,
ROBERT E. MANN,
NORMAN C. HANSON, and
MICHAEL A. GRAL,

    Defendants.

Case No. 05-CR-013

## SUPERSEDING INFORMATION

**The United States Attorney Charges:**

Overview

1. Between on or about May 1, 2000, and on or about July 16, 2004, in the State and Eastern District of Wisconsin, and elsewhere,

> **Robert G. Brownell,
> Robert E. Mann,
> Norman C. Hanson, and
> Michael A. Gral,**

did knowingly conspire among themselves and with others known and unknown to device and execute a scheme to defraud, which scheme was executed by use of the U.S. mail and interstate wire communications, in violation of Title 18, United States Code, Sections 1341 (mail fraud) and 1343 (wire fraud).

2.  The defendants' scheme to defraud included a scheme to deprive another of the intangible right to honest services.

3.  The object of the conspiracy was to obtain money for the defendants, their businesses, as well as others conspirators, and their companies; and to fund contributions to candidates for public office.

## Background

4.  Bielinski Brothers, Inc. is a Waukesha County-based residential and commercial construction company. It operates under various corporate names, including Bielinski Homes and Bielinski Development, Inc. (herein collectively referred to as "Bielinski Brothers"). Bielinski Brothers is involved in more than $100 million in new home construction each year.

5.  Robert G. Brownell began working for Bielinski Brothers in 1995. From approximately 2001 until July of 2004, Brownell served as Chief Executive Officer of Bielinski Brothers. He was paid approximately $175,000 per year. Brownell was also a partner with Frank and Harry Bielinski in FHB Investments, LLC.

6.  As part of his duties at Bielinski Brothers, Brownell approved the payment of invoices associated with development and new home construction. These invoices included work for surveys, analysis, grading and similar activity at the start of the construction of a residential subdivision.

7.  Mann Brothers, Inc. is an Elkhorn-based construction company that provided grading and other construction work for Bielinski Brothers. During the time

2

period of the conspiracy, Mann Brothers performed approximately $20 million in work for Bielinski Brothers each year.

8. Robert E. Mann was the president and part-owner of Mann Brothers, Inc.

9. Welch Hanson & Associates is civil engineering firm in Delafield, Wisconsin. The firm also includes surveyors and landscape architects. The firm is a division of Yaggy Colby & Associates.

10. Norman C. Hanson is a principal in Welch Hanson & Associates. He also is a partner in a separate, unrelated limited liability company called NCCBH.

11. Michael A. Gral was a partner at the law firm Michael Best & Friedrich. He served as a lawyer for Bielinski Brothers.

## Kickback and Embezzlement Scheme

12. In addition to working for Bielinski Brothers, Brownell operated various businesses alone and in partnership with others. They included: (a) DSI, or Development Services, Inc.; (b) SEWMA, or Southeastern Wisconsin Market Analysts; (c) Georgetown Holdings, LLC; (d) Georgetown Development, LLC; (e) Georgetown Investments, LLC; and (e) Belize, LLC.

13. As part of a scheme to defraud Bielinski Brothers and others, Brownell approved invoices from other business entities knowing that the invoices were fraudulent and had been inflated.

3

14. The money generated as part of the false billings was used for the financial benefit of the defendants and others, as described below.

Mann Brothers

15. Bielinski Brothers hired Mann Brothers to do grading and other work at the start of residential developments.

16. As part of a scheme to defraud Bielinski Brothers, Mann and Brownell agreed to participate in Bielinski Brother's payment of inflated invoices submitted by Mann Brothers.

17. At the start of a project involving Mann Brother and Bielinski Brothers, Brownell and Mann discussed the amount of inflated charges that were to be included on a particular project. That amount varied by the size of the project, the actual work that was needed, and the potential budget.

18. Once Mann Brothers was paid, the excess from the invoices was split equally between Brownell and Robert Mann. Brownell's share was given to him in the form of checks from Mann Brothers to DSI and SEWMA. Brownell provided an invoice from one of his companies to Mann to justify this payment.

19. The inflated and fraudulent invoices from Mann Brothers to Bielinski Brothers, as well as the invoices Brownell provided to Mann Brothers to support the 50-50 split, constituted materially false pretenses, representations, and promises.

4

### Welch Hanson

20. Also during the time period of the conspiracy, Brownell directed actual Georgetown projects, including residential construction. One such project was the Conservancy, a high-end residential development in Cedarburg, Wisconsin. As part of his fraudulent activity, Brownell directed various contractors, including Welch Hanson & Associates, to issue bills to Bielinski Brothers for work actually performed on Georgetown projects, including the Conservancy, even though the work was not done for Bielinski Brothers. The payments were approved by Brownell and issued by Bielinski Brothers.

21. As a result, Bielinski Brothers unwittingly paid invoices on projects that were the private business interests of Brownell and others.

22. Brownell and Norm Hanson agreed to this method of payment.

23. In addition, Norm Hanson agreed to use his NCCBH entity, as well as Welch Hanson & Associates, to issue fraudulent invoices to Bielinski Brothers that were unrelated to any actual project. Brownell approved the payment of these fraudulent invoices.

24. The majority of the money generated from the false billings was sent to Brownell through one of his business entities; though Hanson often kept a small percentage for personal use.

25. The inflated and fraudulent invoices from Welch Hanson & Associates and NCCBH to Bielinski Brothers constituted materially false pretenses, representations, and promises.

### Brownell-Gral Partnerships

26. Brownell and Gral were business partners in various entities, including Georgetown Holdings, LLC; Georgetown Development, LLC; Georgetown Investments, LLC; and Belize, LLC. Through their partnerships, Brownell and Gral purchased and developed real estate in Wisconsin and Florida. As part of the scheme, the defendants fraudulently used funds belonging to Bielinski Brothers to make down payments, purchase, and pay for development costs for such real estate.

27. At the same time, Gral, while with the Michael Best & Friedrich law firm, served as a lawyer for Bielinski Brothers, as well as for its owners, Harry and Frank Bielinski. During the time period of the conspiracy, Michael Best & Friedrich billed Bielinski Brothers approximately $4 million for work performed by Gral and others at the firm.

28. Based on his role as an attorney, Gral owed a fiduciary duty to Bielinski Brothers and Harry and Frank Bielinski personally.

29. As a further part of the scheme to defraud, Gral misused that fiduciary duty for private gain.

30. Gral engaged in actions, individually and through Brownell, that served his own financial interest to the detriment of Bielinski Brothers at the same time that Gral was serving as a lawyer for Bielinski Brothers.

31. On such transaction was as follows. In the fall of 2002, Brownell and Gral, through Belize, LLC, entered into an agreement to purchase a condominium in Florida. Brownell had Bielinski Brothers pay in excess of $500,000 as a deposit for the purchase of the Florida condominium. The payment was authorized by Brownell without the knowledge or approval of Frank and Harry Bielinski and was made to appear as a legitimate Bielinski Brothers' expenditure.

32. In January 2004, Gral and Brownell entered into an agreement to have FHB Investments (as described in paragraph 5 above) act as an agent for Georgetown Investments to purchase real estate located in Lincoln County, Wisconsin known as Harrison Lakes. The purchase price for this property was approximately $1,500,000. As part of this agreement, Gral and Brownell fraudulently used funds belonging to FHB Investments to purchase this property. Despite the fact that Gral was the lawyer for Bielinski Brothers and its owners, the agreement was entered into without the knowledge or approval of Frank and Harry Bielinski. In July, 2004, Gral and Brownell transferred the Harrison Lakes property from FHB Investments to Georgetown Investments.

33. Brownell and Gral further entered into an arrangement whereby Brownell would provide Gral and his law firm with checks drawn on Bielinski

7

Brothers accounts, which did not have sufficient funds to cover the amount of these checks. These checks totaled in excess of $2 million. Gral agreed not to negotiate these checks and to provide Brownell with escrow agreements representing that the funds were on deposit with his law firm.

34. The actions of Gral and Brownell deprived Bielinski Brothers, and Frank and Harry Bielinski individually, of their intangible right to Gral's honest services, as those terms are used in Title 18, United States Code, section 1346. The actions of Gral and Brownell also included materially false pretenses, representations, and promises.

## "Maintenance Account"

35. During the time period of the conspiracy, Brownell and Robert Mann kept a "maintenance account" to be funded by the fraudulent activity described above. The purpose of the account was to supply Brownell and Mann with a pool of money to provide themselves and others with financial benefits.

36. The recipients of the financial benefits further included persons involved with Brownell and Mann in otherwise legitimate business deals, including the owners of other businesses.

37. The "maintenance account" also funded illegal campaign contributions and other benefits to candidates and elected officials as described below.

38. Brownell also provided Hanson with proceeds from the fraud to fund illegal campaign contributions as described below.

8

39. The amount of money involved in the "maintenance account" exceeded $1 million.

## Campaign Contributions

40. Brownell, Robert Mann, Norman Hanson and others associated with them sought to provide campaign contributions to certain candidates for public office. In order to avoid campaign contribution restrictions, Brownell, Mann, and Hanson used corporate funds and proceeds from the "maintenance account" to reimburse themselves and others for contributions to these political candidates.

41. During the time period of the conspiracy, employees of Mann Brothers were provided with approximately $100,000 for the purpose of funding campaign contributions to then-Wisconsin governor Scott McCallum, the 2004 United States Senate race of Russ Darrow, and the 2004 reelection campaign of President George W. Bush. The contributions included the following.

42. In February of 2001, Robert Mann and two others from Mann Brothers provided $25,000 for the inauguration ball of then-Wisconsin governor Scott McCallum. The $25,000 was funded by the "maintenance account."

43. In February of 2002, Mann Brothers provided three of its employees with bonuses totaling $22,500, which, after withholdings, gave the employees a total of just over $15,000. The money was then used by the employees to make a total of $15,000 in contributions to Scott McCallum for his reelection campaign.

9

The maintenance account was used to reimburse Mann Brothers approximately $21,000 of the bonuses.

44. In August of 2002, Mann Brothers provided two other persons with $15,000, so that (after withholdings) $10,000 was available for a McCallum fund raiser. The maintenance account was used to reimburse Mann Brothers.

45. Similar funding schemes were used to provide the President George W. Bush reelection campaign with $21,000; and the Russ Darrow campaign for U.S. Senate with $17,000.

46. Robert Brownell used the maintenance account to reimburse himself and others at Bielinski Brothers approximately $19,000 for campaign contributions. Approximately $13,000 went to the campaign of then-Wisconsin governor Scott McCallum; approximately $4,000 went to the 2004 United States Senate race of Russ Darrow; and approximately $2,000 went to the 2004 reelection campaign of President George W. Bush.

47. Norman Hanson used proceeds of the fraud to reimburse himself and others at Welch Hanson approximately $57,500 for campaign contributions. Approximately $43,500 went to the campaign of then-Wisconsin governor Scott McCallum; approximately $8,000 went to the 2004 United States Senate race of Russ Darrow; and approximately $6,000 went to the 2004 reelection campaign of President George W. Bush.

## Total Losses

48. The amount of losses caused by the scheme to defraud exceeded $4 million.

## Mail and Wire Fraud

49. Brownell, Mann, Hanson, and Gral, and others acting in concert with them and on their behalf, for the purpose of executing and attempting to execute the scheme to defraud did cause and intend to cause matter to be delivered by the United States Postal Service and commercial interstate carriers according to the directions thereon. The mail matter included the invoices and checks described above.

50. Brownell, Mann, Hanson, and Gral, and others acting in concert with them and on their behalf, for the purpose of executing and attempting to execute the scheme to defraud did cause and intend to cause interstate wire communications. These interstate wire communications included the transfer of funds from the State of Wisconsin to other locations including the State of Florida.

All in violation of Title 18, United States Code, section 1349.

Jan 19, 2005
Date

STEVEN M. BISKUPIC
United States Attorney